[Civ. No. 35577. First Dist., Div. One. Aug. 19, 1975.]

INTOXIMETERS, INC., et al., Plaintiffs and Appellants, v. EVELLE J. YOUNGER, as Attorney General, etc., et al., Defendants and Respondents.

264

**COUNSEL**

Blair F. Burton and James L. Quick for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Charlton G. Holland, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

**ELKINGTON, J.**—To reduce the incidence of accidents on the state's highways, California in 1966 entered upon a program of testing the blood, breath or urine of motor vehicle drivers lawfully arrested for an offense committed while under the influence of intoxicating liquor. The test results were made available for use as evidence in the prosecution of such offenses. (See Veh. Code, §§ 13353, 13354.)

Thereafter the state's Department of Public Health was directed by the Legislature to "adopt and publish such rules and regulations to be used in approving and governing the operation of laboratories engaging in the performance of [such] tests." (Health & Saf. Code, § 436.50.) Among other things, the Department of Public Health's rules and regulations were to establish procedures "in administering breath tests for the purposes of determining the concentration of ethyl alcohol in a person's blood." (Health & Saf. Code, § 436.52.)

The required rules and regulations were thereafter adopted by the Department of Public Health. They are found in the California Administrative Code, title 17, sections 1215-1222.2, inclusive.

In 1972 the Office of Procurement of the Department of General Services received from the Department of Justice a request for an evaluation of the three available breath testing instruments, including those sometimes known as "Intoximeter" and "Intoxilyzer." Pursuant to this request the Office of Procurement tested the several instruments. It thereafter prepared an "Inspection Report" in which, among other things, it was concluded that the Intoxilyzer was "the only article which will properly meet the needs of the agency," and that because of its operational qualities "a sole source procurement" within the meaning of section 14807 of the Government Code was justified.[1]

The Department of Public Health also evaluated the Intoxilyzer and found it to meet the standards of performance fixed by its rules and regulations.

---

[1] Of the 18 "rating factors" used in the evaluation, the Intoxilyzer was found superior to the other instruments in 9 instances, and at least equal in 8 others. The remaining factor related to analysis of breath samples taken at distant points, a use unintended by the Department of Justice.

The state thereafter issued a purchase order for 98 Intoxilyzers from a commercial supplier of that instrument.

The instant action was brought by plaintiffs Intoximeters, Inc. and Cal Detect, Inc., the manufacturer and supplier, respectively, of the Intoximeter. By it they sought a writ of mandate directing the several defendant state officials "to desist and refrain from taking any further action or proceedings in issuing a sole source procurement order" for Intoxilyzers. The trial court entered judgment in favor of the defendants.

Plaintiffs Intoximeters, Inc. and Cal Detect, Inc. have appealed from the judgment.

The action below was for the traditional writ of mandate, permitted by Code of Civil Procedure section 1085, *"to compel the performance of an act which the law specially enjoins."* (Italics added.) It did not involve the so-called "administrative mandamus" of Code of Civil Procedure section 1094.5.

It was contended in the superior court, as it is here, that: "The Department of Health has not complied with its own rules and regulations which had the effect of statutory law."[2] The argument is that the Intoxilyzer is not "specific" for ethyl alcohol, and thus falls short of the standards fixed by sections 1215.1(a), 1220.1(b), 1221 and 1221.2(e) of the above-mentioned California Administrative Code.

Section 1215.1(a) provides: " 'Alcohol' means the unique chemical compound, ethyl alcohol, . . ."

Section 1220.1(b) refers to the need for "specificity" of all three of the permitted tests, *blood, urine and breath.* It states: "The method shall be capable of the analysis of ethyl alcohol with *a specificity which is adequate and appropriate for traffic law enforcement."* (Italics added.)

---

[2] Plaintiffs state in their briefs: "[They] did not object to the exercise of discretion by the Department of Health in establishing those regulations and rules. [They] did not object to the exercise of discretion by Department of General Services and Justice Department in the adoption of purchasing standards or standard specifications or in the determination that a sole source procurement should be made or in the determination of the provisions to be included in a purchase contract except in so far as efforts were made to exercise in a different manner discretion given to another department and already exercised by that department."

Section 1221 recites: "The testing of *breath samples* by or for law enforcement agencies shall be performed in accordance with standards set forth in these regulations." (Italics added.)

Section 1221.2(e) also deals only with the testing of *breath samples.* It states: "The instrument shall be capable of breath alcohol analysis which results in a concentration less than 0.01 grams of alcohol per 100 milliliters of blood when alcohol-free subjects are tested."

Plaintiffs point out correctly that the Intoxilyzer does not distinguish between the presence of ethyl alcohol, and that of methyl alcohol (the so-called wood alcohol), isopropyl alcohol (the so-called rubbing alcohol) and some of the ketones, i.e., acetone, a substance manufactured by the bodies of certain diabetics, and substances which might be inhaled by workmen in certain occupations. It follows, they insist, that the Intoxilyzer does not meet the "specificity" for ethyl alcohol required by the Department of Public Health's own regulations.

Defendants' response to this contention is that such substances are not to be found in the bodies of any significant number of the automobile-driving population, and are not to be found in significant quantities in the breath of the rare drivers whose bodies do contain such substances. They further contend that the Department of Public Health's regulations must reasonably be construed as requiring the breath testing instrument to detect the presence of ethyl alcohol to the exclusion of "other substances *normally or reasonably expectable* within the expired breath" (italics added) of an arrested drunken driver suspect. Since the Intoxilyzer does this, they insist, it is *"adequate and appropriate for traffic law enforcement."* (Italics added.)

 Substantial evidence before the superior court[3] (which had previously been considered by the Department of Public Health and Department of General Services) tended to establish the following.

---

[3]*The substantial evidence rule provides that when a trial court's finding of fact or a jury's verdict is attacked on the ground that it is not sustained by the evidence, the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding or verdict. Questions of credibility must be resolved in favor of the fact finder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court or jury resolved the conflict in favor of the prevailing party. (Green Trees Enterprises, Inc. v.*

■ Methyl alcohol and isopropyl alcohol are intoxicants of a much more toxic nature than ethyl alcohol. Those who have ingested such liquids tend to become ill or comatose and unlikely to drive a motor vehicle, before they would register significantly on a breath testing instrument. Persons who would imbibe such substances, intentionally or accidentally, and then drive an automobile may, if existent at all, be considered a negligible portion of the population. And of course an automobile driver's excessive dosage of such a substance would render him a "person who is under the influence of intoxicating liquor" (*People* v. *Haney,* 100 Cal.App. 295, 297 [279 P. 1054]) against whom the state's "drunk driving" statutes are directed. (See Veh. Code, §§ 23101, 23102.) Acetone, a ketone, "in concentrations which can appear in the breath of living persons does not give an apparent ethyl alcohol result" of any substantiality. Volatile industrial drugs and substances possibly found in a worker's blood and appearing in concentrations sufficient to give a substantial alcohol reading "would be associated with severe poisoning or death . . . any concern about the presence of any of these substances in the body of a driver would be inconsequential." "The entire interference problem is somewhat academic because in actual practice under the conditions under which breath tests are employed, predominantly in traffic law enforcement, substances chemically capable of interfering are generally not present in concentrations yielding marked false apparent alcohol levels." About one-half of 1 percent of the population suffers from a kind of diabetes which, after the fasting of such afflicted and obese persons for several days, causes them to develop a ketone or acetone breath. But studies have shown that such "obese diabetics [and some nondiabetic obese individuals] on a long term total fast (10 to 20 days)" can develop breath acetone levels approaching 100 micrograms per liter of breath; such a breath concentration would register on the Intoxilyzer as less than one-tenth of the presumptive intoxication level.

It may fairly be said that substantial evidence indicated that none of the nonethyl alcohol substances in dispute was "normally or reasonably expectable within the expired breath" of a drunk driver suspect, in any significant quantity.

There was, to be sure, other and contrary evidence. But as we have indicated, we are obliged to assume that the evidence which we have related was believed by the trial court, and previously by the Department

*Palm Springs Alpine Estates, Inc.,* 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805]; *Treadwell* v. *Nickel,* 194 Cal. 243, 260 [228 P. 25].)

of Public Health and the Department of General Services. (See fn. 3, *ante.*)

The trial court found, among other things, that:

"[A]lthough the Intoxilizer would respond to substances other than ethyl alcohol, there was no convincing evidence that the Intoxilizer would respond at levels of measurement for these substances which normally or reasonably would be expected to be found in persons arrested for driving while intoxicated."

"The administrative interpretation of § 1221.2(e), relating to the capability of a breath alcohol analysis instrument to reflect a concentration of less than 0.01 grams of alcohol per 100 millilitres of blood when alcohol-free subjects are tested, *is that the Department of Public Health need only test normal persons, not diabetics or persons who have consumed or have been exposed to acetone, to determine if the instruments submitted for approval meet the performance criteria set forth in § 1221.2(e)."* (Italics added.)

The court thereupon concluded:

*"The interpretation by the Department of Public Health regarding the application of § 1221.2(e) of Title 17 (Group 8) of the California Administrative Code* must be given great weight and, in the evaluation of blood alcohol analysis instruments, including the evaluation of the Intoxilizers, § 1221.2(e) *was lawfully interpreted."* (Italics added.)

"The Department of General Services, in evaluating the Intoxilizer and in issuing the purchase order for 98 intoxilizers did not abuse its discretion in that its decision regarding the 'specificity' of the Intoxilizer, as presented to the Department by the petitioners, was neither arbitrary, capricious nor totally without evidentiary support."

The trial court's findings of fact were, beyond any doubt, supported by substantial evidence. (See fn. 3, *ante.*)

The remaining issues are (1) whether the Department of Public Health's interpretation of its regulations as requiring breath testing instruments to detect the presence of ethyl alcohol "and to exclude other substances *normally or reasonably expectable* within the expired breath" (italics added) of arrested drunk driving suspects, was valid; and (2) if

valid, whether the Intoxilyzer complied with those regulations, as so interpreted.

We first inquire into the proper interpretation of the pertinent regulations.

As pointed out, section 1220.1(b) recites that: "The method [*used in taking blood, urine and breath tests*] shall be capable of the analysis of ethyl alcohol with a specificity which is *adequate and appropriate for traffic law enforcement.*" (Italics added.)

Section 1221.2(e), referring only to the taking of *breath tests,* says: "The instrument shall be capable of breath alcohol analysis which results in a concentration less than 0.01 grams of alcohol per 100 milliliters of blood when alcohol-free subjects are tested." Omitted is the language of section 1220.1(b)—"with a specificity which is adequate and appropriate for traffic law enforcement."

Section 1221 states: "The testing of breath samples by or for law enforcement agencies shall be performed in accordance with standards set forth in these regulations." It is notable that it refers, not to the apparently tighter requirements of section 1221.2(e), but to the standards of the *"regulations"* generally.

■ It is manifest that section 1220.1(b) requires that *all instruments,* i.e., those testing blood, urine *and breath,* need be specific for ethyl alcohol *only* to such extent as is adequate and appropriate for traffic law enforcement. By necessary implication those standards are made applicable to the taking of *breath tests,* as contemplated by section 1221.2(e).

■ Such an interpretation of the regulations is found to be reasonable. "It is the duty of the courts, whenever possible, to interpret statutes so as to make them workable and reasonable." (*City of Santa Clara* v. *Von Raesfeld,* 3 Cal.3d 239, 248 [90 Cal.Rptr. 8, 474 P.2d 976].) ■ And generally the same rules of construction which apply to statutes govern the interpretation of regulations of administrative agencies. (*Cal. Drive-in Restaurant Assn.* v. *Clark,* 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].)

So construed, the Department of Public Health's rules and regulations relating to breath testing instruments are consistent with its approval of the Intoxilyzer.

We are aided in our construction of the regulations at issue by the rule that: "Contemporaneous administrative construction of [an administrative agency's] regulation by the agency charged with its enforcement is entitled to great weight and courts will not depart from such construction unless 'it is clearly erroneous or unauthorized.' " (*Handlery* v. *Franchise Tax Board,* 26 Cal.App.3d 970, 982 [103 Cal.Rptr. 465]; and see *Whittell* v. *Franchise Tax Board,* 231 Cal.App.2d 278, 286 [41 Cal.Rptr. 673].) Here the Department of Public Health concluded that the Intoxilyzer was "capable of the analysis of ethyl alcohol with a specificity which is adequate and appropriate for traffic law enforcement," and was therefore in conformity with its regulations. We cannot say that the conclusion was "clearly erroneous or unauthorized."

No merit is seen in plaintiffs' secondary contention that the "Department of Justice and Department of General Services had not required compliance with General Services' purchasing standards." The contention is based upon Government Code section 14792.5 stating: "The Director of General Services shall establish statewide purchasing standards, . . ." The "standard" claimed to have been so established is found in the previously adverted to "Inspection Report" of the Office of Procurement. It consisted of a description of one of the 18 "rating factors" considered (see fn. 1, *ante*), as follows: "4. *Specificity:* Major. The purpose of the instrument is to detect alcohol in expired breath. Therefore, the evaluation of specificity depends on the ability of the instrument to detect, within the limits of the operation instructions, ethyl alcohol and to exclude other substances normally or reasonably expectable within the expired breath of the subject."

Considered as a "statewide purchasing standard" of the *Director of General Services* under Government Code section 14792.5, it appears that the Intoxilyzer, able "to exclude other substances normally or reasonably expectable within the expired breath of the subject," was in full compliance with that standard.

Furthermore, the Department of General Services did not, and was not required by section 14792.5 to, establish such standards. Health and Safety Code section 436.52 expressly cast the duty upon the Department of Public Health to establish by regulation the standards of performance of breath testing instruments. The specific provisions of the latter statute must be deemed to have superseded the more general provisions of the Government Code. (Civ. Code, § 3534; *Ryder* v. *City of Los Altos,* 125 Cal.App.2d 209, 210-211 [270 P.2d 532].) And the "Inspection Report's"

recital of one of the 18 factors considered may not reasonably be deemed the "statewide purchasing standard" of Government Code section 14792.5.

■ Another related contention is that: "The Department of Justice and Department of General Services had not required compliance with . . . the terms of a contract of purchase." The "contract" here at issue was the Department of General Services' purchase order for 98 Intoxilyzers. It recited: "Units to be specific for ethyl alcohol and shall exclude other substances normally or reasonably expectable in the expired breath of a subject." This recital, requiring exclusion of "other substances normally or reasonably expectable in the expired breath of a subject" was, as we have previously pointed out, consistent with the Department of Public Health's regulations, and with the approval and purchase of the Intoxilyzers.

Plaintiffs lastly contend error in the superior court's striking of certain evidence offered by them on the issue of the Intoxilyzer's specificity. This evidence had not been before the Departments of General Services and of Public Health at the time of their consideration and evaluation of that instrument.

The superior court ruled that: "All objections are sustained to the introduction of evidence, sought to be introduced regarding the performance qualities of the Intoxilyzer, where the petitioners developed no foundation that the evidence had been brought to the attention of or considered by the Office of Procurement or was of such a nature that it should have, as a matter of course, been considered by the Office of Procurement in reaching its decision to purchase the intoxilizer."

We are of the opinion that the reasons given by the superior court were invalid. The proceedings did not concern a review of action of an administrative agency under Code of Civil Procedure section 1094.5, but rather, as indicated, they were brought "to compel the performance of an act which the law specially enjoins." (See Code Civ. Proc., § 1085.) The issue was whether the Intoxilyzers had been approved and ordered in conformity with law, i.e., the pertinent Administrative Code regulations.

But we observe that essentially, the rejected evidence consisted of hearsay writings found in certain medical journals. ■ Experience has shown that isolated reports of this nature are as often as not rebutted by the opinions and experiences of other writers, and that they are

unreliable as proof. Such medical works "are regarded as controversial statements of the author, and undesirable hearsay." (Witkin, Cal. Evidence (2d ed. 1966) § 627, p. 587.) "It has been held, without conflict and in an extended line of cases in this state, that medical works are hearsay and inadmissible in evidence, . . ." (*Baily* v. *Kreutzmann,* 141 Cal. 519, 521 [75 P. 104]; *Furtado* v. *Montebello Unified Sch. Dist.,* 206 Cal.App.2d 72, 78 [23 Cal.Rptr. 476]; see also *People* v. *Conrad,* 31 Cal.App.3d 308, 321, fn. 9 [107 Cal.Rptr. 421]; *Brown* v. *Los Angeles Transit Lines,* 135 Cal.App.2d 709, 716 [287 P.2d 810]; *Gluckstein* v. *Lipsett,* 93 Cal.App.2d 391, 401 [209 P.2d 98]; *People* v. *Hooper,* 10 Cal.App.2d 332, 335 [51 P.2d 1131]; *Forrest* v. *Fink,* 71 Cal.App. 34, 40 [234 P. 860].) Other of the rejected evidence consisted of testimony of the president of one of the plaintiff companies. He said he had personally tested certain industrial workers and found measurable quantities of acetone on their breath. He had made no attempt, however, to "determine what would be the reading in their breath after they actually left the plant," nor did he "have any idea of how many of these individuals were afflicted in the general population at large."

The testimony here at issue had no significant probative value. We opine that its disallowance was nonprejudicial, and harmless under the standards of the state's Constitution, article VI, section 13, and *Hrnjak* v. *Graymar, Inc.,* 4 Cal.3d 725, 734 [94 Cal.Rptr. 623, 484 P.2d 599, 47 A.L.R.3d 224].

In their closing brief plaintiffs urge that the Department of Public Health and Department of General Services *abused their discretion* in approving equipment that did not comply with the Administrative Code, and varying the "standard established by the Health Department." For the reasons previously stated, the contentions are found invalid.

From all of the foregoing we have determined that the trial court's findings of fact were supported by substantial evidence, that its conclusions were in accordance with law, and that its proceedings were otherwise without substantial, or prejudicial, error.

The judgment is affirmed.

Molinari, P. J., and Sims, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied October 16, 1975.