The State of Ohio, Appellant, v. Brockway et al., Appellees.

(No. 1066—Decided August 26, 1981.)

*Mr. Gary E. Hunter,* for appellant.

*Mr. Michael A. Likavec* and *Mr. Stephen G. Thompson,* for appellees.

*Mr. William J. Brown,* attorney general, and *Mr. Joseph E. Scuro, Jr.,* for Ohio State Highway Patrol, *amicus curiae.*

Stephenson, J. This is an appeal by the state from a judgment entered by the Athens County Municipal Court granting a motion to suppress evidence of the results of intoxilyzer alcohol breath tests in the prosecution of certain cases of operating a motor vehicle while under the influence of alcohol.[1] The following errors are assigned by appellant with essentially solidated for motion purposes of prosecutions wherein tests were taken of the defendants, but, also, includes proceedings under R.C. 4511.191, the implied consent statute.

---

[1] While not discernible from the record, appellees' brief states not only were cases con-

similar assignments of error by the Ohio State Highway Patrol in an *amicus curiae* brief:

"1. The decision of the Athens County Municipal Court finding that test results of the intoxilyzer Model 4011 are not admissible as evidence in a court of law because the instrument is inherently unreliable is in error as an unlawful encroachment of the judiciary upon a legislative function since Ohio Revised Code Section 4511.19 establishes the blood alcohol level for a rebuttable presumption of intoxication authorizing a breath test approved by the Department of Health to determine this blood alcohol level and the Department of Health by Administrative Rule 3701-53-02(B)(4) approves the use of the intoxilyzer.

"2. The decision of the Athens County Municipal Court finding that test results of the intoxilyzer Model 4011 are not admissible as evidence in a court of law because the instrument employs methods or techniques not generally accepted by the relevant scientific community and because the process incorporates several inferences which cannot be proven by substantial assurance to be more likely valid than invalid is in error because it is against the manifest weight of the evidence." (Numbering by court.)[2]

Appellees filed a dual-pronged pretrial motion in the court below seeking, in effect, (1) to exclude in limine any intoxilyzer test results and attendant presumptions for the reason such tests are not a "chemical analysis" of a person's breath as required by R.C. 4511.19 for admissibility and (2) to suppress the test results for the reason the intoxilyzer process "is not a sufficiently reliable scientific test generally accepted by the scientific community."

An evidentiary hearing was thereafter conducted in which the appellees presented an expert witness, one Walter J. Frajola, Ph.D, an expert in bio-chemistry, and the state presented Leonard J. Porter, Chief of the Division of Bio-chemistry and Toxicology for the Ohio Department of Health and Chief of the Alcohol Testing, Approval and Permit Program of the department.

In summary, Dr. Frajola testified the intoxilyzer process was unreliable for the reason that other carbon-hydrogen compounds are sensitive to light with a wavelength of 3.39 microns. Acetone is a carbon-hydrogen compound which primarily absorbs infrared light at different wavelengths. However, acetone also has a secondary absorption point at 3.39 microns. Dr. Frajola testified that acetone is a substance commonly found in the human body, especially in people who are diabetic or who are dieting. According to Dr. Frajola, the presence of acetone in the body could be detected by the intoxilyzer and cause the intoxilyzer to give a false reading.[3]

Dr. Frajola further testified that the constant 2,100 used to convert the breath-alcohol percentage into a blood-alcohol percentage may lead to inaccurate and misleading results. Dr. Frajola criticized the use of the constant ratio for the reason that the proportion to which

---

[2] A motion to suppress, the subject of this appeal, was granted in a "Decision" entered July 14, 1980, followed by a "Revised Decision" on July 29, 1980. The parties herein, and apparently the trial court, since no formal entry was filed on the decisions, have treated the decision as a judgment and it will be so treated here although preferable practice should have been to incorporate the decisions into a journal entry. Cf. *Millies v. Millies* (1976), 47 Ohio St. 2d 43 [1 O.O.3d 26].

[3] The assertion that the presence of acetone in the breath renders the test unreliable is not novel. See *Intoximeters, Inc. v. Younger* (1975), 53 Cal. App. 3d 262, 125 Cal. Rptr. 864, wherein such claim was made and was rejected by the court. See, also, *State v. Moore* (Del. 1973), 307 A. 2d 548.

breath-alcohol percent relates to blood-alcohol percentage varies from person to person according to several factors including temperature and the person's hematocrit count. According to Dr. Frajola, studies have indicated that a person's blood-breath alcohol ratio varies from a low of 1,900 to a high of 2,400.

In summary, Mr. Porter testified as to the procedures and the tests performed upon the intoxilyzer process prior to its adoption by the Ohio Department of Health as a valid means of measuring blood-alcohol percentages.

Essentially, Mr. Porter testified that the intoxilyzer process underwent extensive tests to determine the effect acetone has on the validity of the test results. As a result of these tests it was determined that indeed the intoxilyzer would detect acetone and would thus give a false blood-alcohol percent. However, in order for acetone to have any appreciable bearing on the blood-alcohol percentage, the amount of acetone that would be required to be present would be above the proportionate levels considered to be toxic to a human being.[4]

Mr. Porter further testified that it was his opinion that neither temperature nor blood hematocrit would cause varying results in the breath test. It was further noted that all other breath testing machines use the deep lung blood breath ratio of 2,100 to 1.

The trial court thereafter by written decision concluded essentially (1) that the intoxilyzer process was a chemical analysis within the meaning of R.C. 4511.19 and (2) that the intoxilyzer is scientifically unreliable for the reasons testified to by Dr. Frajola including, *inter alia,* the conversion factor of 2,100 to 1 of breath alcohol to blood alcohol is inaccurate.[5]

Because of the posture adopted by the court below with respect to what it perceived to be the issues presented by the motion and the assertion by appellees that the first assignment of error was not saved for appellate review, it is necessary to delineate what we perceive as the pivotal issues posited for review. We note first that the usual attacks on alcohol breath test results were not claimed below. Thus, no claim was advanced below, or here, that the intoxilyzer is not an approved test adopted by the Ohio Director of Health; that the tests were improperly administered; that statutory requirements otherwise were not met; or that the authority granted the director is an improper delegation of legislative power.

The trial court essentially concluded

---

[4] The intoxilyzer process involves the taking of a breath sample blown into the machine and collected in a testing chamber. The intoxilyzer then measures the amount of alcohol in one's breath by passing an infrared light source through the air chamber. The infrared light source has a wavelength of 3.39 microns. Alcohol has a physical characteristic of absorbing light with a wavelength of 3.39 microns. As the infrared light is passed through the air chamber, the alcohol that is present in the breath sample absorbs some of the infrared light, the amount of light being absorbed being in direct proportion to the amount of alcohol in the breath sample. The amount of light which passes through the test chamber is then measured by a photoelectric detector. As can be seen, the basic premise behind calculating the percentage of alcohol in the breath sample is that the higher the percentage of alcohol in the breath sample, the lesser the amount of infrared light which passes through the test chamber and is detected by the photoelectric cell. The next step in the intoxilyzer process is to convert the breath-alcohol percent into a blood-alcohol percentage. This is accomplished by multiplying the breath-alcohol percent by a constant factor of 2,100.

[5] Inasmuch as the court found against appellees upon the chemical analysis issue and no cross-assignments of error were filed by appellees pursuant to R.C. 2505.22 the correctness of that ruling is not before us. See *Parton* v. *Weilnau* (1959), 169 Ohio St. 145 [8 O.O.2d 134].

the issue to be whether, under the evidence, the test was unreliable and that, if it so found, it was required to sustain the motion to suppress. We view the more precise issue to be whether the test result is admissible under statutory, rule and applicable court decisions irrespective of the court's conclusion as to test result reliability.

By so formulating the issue, we reject appellees' argument that we may not consider upon the admissibility issue relevant statutes and administrative rules for the reason they were not expressly argued in the trial court by appellant to be controlling. Suffice it to say, the issue of admissibility of the test results was before the court and a necessary concomitant thereof was applicable law. The fact that the General Assembly has legislatively provided for the admission of alcohol breath tests in R.C. 4511.19 if analyzed in accordance with methods approved by the Director of Health is an integral, indeed, controlling consideration, upon the admissibility issue and cannot properly be ignored and removed from consideration if the issue of admissibility is to be correctly resolved. Particularly so here where the effect of the order, insofar as it rejects the conversion ratio upon which all breath test machines operate, would bar all further breath tests in Athens County.

It has generally been the proposition of this court to refuse to review alleged errors of the trial court which were not raised in the court below. See *Nanna* v. *Village of McArthur* (1974), 44 Ohio App. 2d 22 [73 O.O.2d 14]. However, this court has discretion to review all errors which appear in the record, regardless of whether or not they were raised at the trial court. See *Columbus* v.*Rogers* (1975), 41 Ohio St. 2d 161 [70 O.O.2d 308]; App. R. 12(A).

In addition, it is the generally accepted view that appellate courts " 'in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.' " *United States* v. *Socony-Vacuum Oil Co.* (1940), 310 U.S. 150, 239.

The wide acceptance by courts of alcohol breath tests in "drunk driving" cases is not open to argument and decisions so holding are legion. In *Westerville* v. *Cunningham* (1968), 15 Ohio St. 2d 121 [41 O.O.2d 119], Chief Justice Taft stated, "such tests are today generally recognized as being reasonably reliable on the issue of intoxication when conducted with proper equipment and by competent operators."

Prior to amendment in 1968 of R.C. 4511.19 in 132 Ohio Laws, Part I, 1632, the admission of such test results was controlled by common law principles which required, by judicial decision, proof by the prosecution that the instruments were in proper working order, that the operator was qualified and that the test results be interpreted for the trier of fact by an expert witness as it related to the defendant being under the influence of alcohol. *Mentor* v.*Giordano* (1967), 9 Ohio St. 2d 140 [38 O.O.2d 366]; *State* v. *Miracle* (1973), 33 Ohio App. 2d 289 [62 O.O.2d 440].

In 1968, in Amended Substitute House Bill No. 380, R.C. 4511.19 was amended, in the part here pertinent, to read as follows:

"No person who is under the influence of alcohol or any drug of abuse shall operate any vehicle, streetcar, or trackless trolley within this state.

"In any criminal prosecution for a violation of this section, or ordinance of any municipality relating to driving a vehicle while under the influence of alcohol, the court may admit evidence on the concentration of alcohol in the defendant's blood at the time of the alleged violation as shown by chemical analysis of the defendant's blood, urine, breath, or other bodily substance withdrawn within two hours of the time of such alleged

violation. When a person submits to a blood test at the request of a police officer under section 4511.191 of the Revised Code, only a physician or a registered nurse shall withdraw blood for the purpose of determining the alcoholic content therein. This limitation does not apply to the taking of breath or urine specimens. Such bodily substance shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director of health pursuant to section 3701.143 of the Revised Code. Such evidence gives rise to the following: * * *''

In the same Act R.C. 4511.191 respecting implied consent and license revocation for refusal to take an alcohol test was enacted. Additionally, at the same time, R.C. 3701.143 was enacted which reads as follows:

"The director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol in a person's blood. The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses. Such permits shall be subject to termination or revocation at the discretion of the director.''

Pursuant to such statutory grant of authority, administrative rules have been enacted upon the subject of alcohol tests and appear in Ohio Adm. Code Chapter 3701-53. Included therein are the following:

"3701-53-01   Techniques or methods

"(A)   Tests to determine the concentration of alcohol in a person's blood may be applied to blood, urine, breath, or other bodily substance. Results shall be expressed as equivalent to grams of alcohol per one hundred (100) milliliters of blood. The results of the tests shall be entered in a record book and said results shall be retained for not less than three years.

"(B)   Written methods or techniques for performing tests in use under division (A) of this rule shall be on file in the area where tests are performed.''

"3701-53-02   Breath tests

"(A)   Breath samples of deep lung (alveolar) air shall be analyzed with instruments specifically designed for the analysis of breath. *The calculation of the blood alcohol concentration shall be on the basis of deep lung (alveolar) air to blood ratio of 2,100:1* and of mixed expired air to blood ratio of 3,200:1. Breath samples shall be analyzed according to instructions issued by the director of health.

"(B)   The following breath testing instruments are approved:

"(1)   Breathalyzer;

"(2)   Alcometer;

"(3)   Sober-meter model III;

"(4)   *Intoxilyzer*;

"(5)   GC Intoximeter.'' (Emphasis added.)

It is evident from the statutory scheme upon the subject that it was the intention of the General Assembly to meet and address the problem of the drunken drivers upon the roads of Ohio and to do so by legislatively providing for the admission into evidence of alcohol test results, including breath tests, if conducted in accordance with procedures adopted by the Director of Health, of one accused of violating R.C. 4511.19. It must be presumed that the General Assembly acted upon adequate investigation and with an awareness that not all scientific authorities accepted the tests as reliable, that breath tests were not one hundred percent accurate, but reasonably so with minor deviations. Further, it is evident that the General Assembly intended, because of the numerous types of equipment and procedures available for such alcohol tests, to achieve uniformity in testing in Ohio by delegating to the Director of Health authority to choose and ap-

prove of the specific tests and procedures to be used in Ohio. Such delegation is not novel and is utilized in such states as Alabama, Connecticut, Missouri and Florida. See *State* v. *Bender* (Fla. 1980), 382 So. 2d 697.

Appellees contend that even though the Director of Health approves a specific test, this may be disregarded by the trial court and the court may independently determine the reliability of test procedure. In short, it is contended that the common law criteria of admissibility continue for the reason R.C. 4511.19 provides, *inter alia*, "the court *may* admit evidence on the concentration of alcohol in the defendant's blood." Such construction of the statute is negated by *Cincinnati* v. *Sand* (1975), 43 Ohio St. 2d 79 [72 O.O.2d 44], wherein the court held in syllabus language that test results are admissible if it is shown (1) the two hour provision was met, (2) the analysis was in accordance with methods approved by the Director of Health and (3) the test was conducted by persons holding proper permits.

In *State* v. *Bender, supra,* the Florida Supreme Court went even further and stated with respect to the admissibility of alcohol test results, under a statutory and rule scheme similar to Ohio's, the following:

"When the prosecution presents testimony in evidence concerning motor vehicle driver intoxication which includes an approved alcohol test method by a properly licensed operator, the fact finder may presume that the test procedure is reliable, the operator is qualified, and the presumptive meaning of the test as set forth in section 322.262(2) is applicable. The test results are admissible into evidence only upon compliance with the statutory provisions and the administrative rules enacted by its authority. *Gillman* v. *State,* 373 So. 2d 935 (Fla. 2d DCA, 1979); *State* v. *Wills,* 359 So. 2d 566 (Fla. 2d DCA, 1978)." *Id.* at 699.

In sum, the court below failed to give recognition to the necessary legislative determination that breath tests, properly conducted, are reliable irrespective that not all experts wholly agree and that the common law foundational evidence has, for admissibility, been replaced by statute and rule; and that the legislative delegation was to the Director of Health, not the court, the discretionary authority for adoption of appropriate tests and procedures, including breath test devices. The court in granting the motion to suppress improperly substituted the court's judgment as to the reliability of the testing procedures for that of the Director of Health. While conceivably the Director of Health could abuse his discretion in the approval of a specific test, such abuse is not even arguably shown in this record given the procedures, methods, tests, consultations with recognized experts and standards utilized prior to approval of the intoxilyzer as a breath testing instrument.

By so concluding, we are not precluding the admission of defense expert testimony as to testing procedures at trial going to *weight*, and not admissibility, inasmuch as the presumption created in R.C. 4511.19(B) is rebuttable. See *State* v. *Myers* (1971), 26 Ohio St. 2d 190 [55 O.O.2d 447]. In *State* v. *Bender, supra,* the Florida Supreme Court stated in this respect:

"The presumptions are rebuttable, and a defendant may in any proceeding attack the reliability of the testing procedures, the qualifications of the operator, and the standards establishing the zones of intoxicant levels. In addition, other competent evidence may be presented to rebut the presumptions concerning whether the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired." *Id.* at 699.

Accordingly, the first assignment of error is sustained. Because the proper issue before the court below was *not* one of a determination of whether the test procedure was reliable or unreliable based

upon the testimony of opposing expert witnesses, but one of whether the Director of Health abused his discretion, the second assignment of error is likewise sustained. The judgment is reversed and the cases remanded to the trial court for further proceedings.

*Judgment reversed and cases remanded.*

GREY, P.J., and ABELE, J., concur.