**CITY OF SIDNEY,**

v.

**GOODRICH.**

Sidney Municipal Court, Shelby County, Ohio.

No. 95TRC06751.

Decided June 26, 1996.

*Tonya Thieman,* Sidney Prosecutor, for plaintiff.

*Thomas A. Ballato* and *Richard H. Wallace,* for defendant George W. Goodrich.

---

DONALD G. LUCE, Judge.

This matter came before the court on defendant's motion to suppress. Thirteen cases were consolidated and evidence was heard on May 7, 1996, on the issue of whether the target values for Batch Nos. 44 and 96901, as certified by the Ohio Department of Health, reflect the actual target values of these calibration solutions.

The Ohio Department of Health has certified that the target value of Batch No. 44 is .100 grams per 210 liters and the target value of Batch No. 96901 is .100 grams per 210 liters. Two subissues are as follows:

1. Has the state of Ohio met its burden of proof and compliance with Ohio Adm.Code 3701–53–04(A), *i.e.,* are the calibrations of the breath-testing machine performed both immediately prior and immediately subsequent to the breath tests of the various defendants within .005 grams per 210 liters of the target value of the Batch No. 44 and Batch No. 96901?

2. Did the Ohio Department of Health abuse its discretion in certifying the target value of Batch Nos. 44 and 96901 as .100 grams per 210 liters?

Both parties presented experts. The defendant presented the testimony of Dr. Alfred E. Staubus. The plaintiff presented the testimony of Steven Wagner.

For reasons set forth later on in this entry, the questions relating to Batch No. 44 will be taken separately from those relating to Batch No. 96901.

## I. Batch No. 44.

■ The starting point for this analysis must be the original authority given to the Director of Health pursuant to R.C. 3701.143, which states as follows:

"For purposes of section 4511.19 of the Revised Code, the director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse in the person's blood, urine, breath, or other bodily substance. The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses. Such permits shall be subject to termination or revocation at the discretion of the director."

Therefore, the Director of Health is granted authority to determine regulations, procedures and protocol. However, as pointed out by defendant, these processes must be "satisfactory," as required in the above section, and, of course, the director cannot abuse his discretion.

Pursuant to this section, various rules have been promulgated in Ohio Adm. Code Chapter 3701–53, including Ohio Adm.Code 3701–53–04(A), which states as follows:

"(A) Approved evidential breath testing instruments shall be checked for calibration no less frequently than once every seven days by a senior operator using a solution of ethyl alcohol approved by the director of health and using the calibration checklist for the instrument being checked, as set forth in appendices A to G to this rule.

"(1) A calibration check of a breath testing instrument is valid when the result of the calibration check is at target value plus or minus five one-thousandths (0.005) grams per two hundred ten liters. The results of a calibration check shall be recorded on a calibration checklist. A calibration solution shall not be used more than three months after its date of first use. The date of first use for the calibration solution and its identification data shall be recorded on the calibration checklist used for that calibration check."

Steven Wagner, Chief of the Toxicology Branch of the Department of Health ("Wagner"), testified as to the protocol followed by the Department of Health in regard to these calibration solutions. Once the manufacturer makes a batch of solution (which may be a volume of two or three thousand gallons), the manufacturer sends to the Department of Health three or four bottles selected at random from the solution. The Department of Health then conducts an analysis of three or four replicates taken from each bottle. Along with these samples the manufacturer also sends a certificate stating the target value of the solution as determined by the manufacturer. The protocol of the Department of Health then is to test the various replicates to verify the manufacturer's target value. Wagner testified that so long as this testing results in a value within five percent of that certified by the manufacturer, then this value is considered verified pursuant to Ohio Department of Health protocol. The target value as determined by the manufacturer then is "certified" and sent out to the various law enforcement agencies.

In regard to Batch No. 44, this protocol was followed. The manufacturer, Miami Valley Regional Crime Laboratory ("Miami Valley"), certified Batch No. 44 as having a target value of .100 grams per 210 liters. Four bottles of this Batch No. 44 were then sent to the Ohio Department of Health. The Ohio Department of Health then took three replicates from each bottle of solution and conducted independent tests. These tests indicated that Batch No. 44 had a

target value of .102 grams per 210 liters. It should be noted that .102 grams per 210 liters is within plus or minus five percent of the target value as certified by the manufacturer, to wit, .100 grams per 210 liters. Wagner testified that the protocol of the Ohio Department of Health was followed and that, since the Ohio Department of Health's tests were within five percent of the stated value of the manufacturer, the manufacturer's value was "verified" and accepted as true.

Sometime after this testing was accomplished concerns were raised as to the accuracy of the target values of all calibration solutions used in the state, and Leonard Porter, the then Chief Toxicologist for the Department of Health, took the results of the initial Department of Health tests on Batch No. 44 and performed an independent calculation of the target value. It should be noted that no further tests were performed on different solutions or representative samples of Batch No. 44, but rather the calculations were independently redone. Porter's calculations indicated that the target value of this sample was .102 grams per 210 liters, thereby confirming the earlier work performed by the Department of Health.

In response to Porter's findings, the Department of Health caused Dr. Craig Sutheimer and James Ferguson to perform a review of the original scientific data compiled by the Department of Health when Batch No. 44 first arrived from Miami Valley. Again, it should be noted that additional tests on samples from Batch No. 44 were not performed, but rather the figures were independently recalculated. These results verify Porter's conclusion as well as the preliminary Ohio Department of Health tests that the target value from these particular samples was .102 grams per 210 liters.

The essence of the question presented is whether plus or minus five percent deviation, in statistical analysis terms, is scientifically acceptable. As Dr. Staubus testified, there is no "absolute" value as each and every testing procedure has its own imperfections. The best science can do is to obtain a range of values and, since a range of values is impractical from which to work calculations, the acceptable scientific method is to take an average, or a "mean" of the range, and thereby achieve a value that can be assigned as the concentration of the solution. It is critical to note that the value so calculated is not an absolute or true value as such but is rather an average of several values, to wit, the range. It is the best that science can do. Both experts agreed that this methodology is scientifically acceptable.

So when the manufacturer and/or the Department of Health certifies a target value, these entities are merely taking an average of a range. Then the critical question becomes, What is an acceptable range? The experts Dr. Staubus and Wagner termed this question the acceptable range of variability, and the experts differed as to whether the acceptable range of variability was plus or minus one

percent, as stated by Dr. Staubus, or plus or minus five percent, as stated by Wagner.

If the acceptable range of variability is plus or minus five percent, then the original test performed on Batch No. 44 for the Department of Health and the independent calculations performed by Porter as well as the independent calculations performed by Dr. Sutheimer and Ferguson are all within plus or minus five percent of the manufacturer's value and therefore the manufacturer's target value has been verified by the protocol. By definition then the procedure is scientifically sound and the certification should have been granted. If the acceptable range of variability is plus or minus one percent, then these various tests do not verify the manufacturer's target value and certification should not have been granted.

So one question that remains to be resolved is whether or not the acceptable range of variability is plus or minus five percent or plus or minus one percent. The range of variability of support for the plus or minus one percent is supported by the opinion of Dr. Staubus, who states that this is the reasonable degree of scientific accuracy in statistical analysis terms. He further states that Pharmacopeia, a nationally recognized text on pharmaceutical issues, holds that the acceptable range of scientific accuracy is .8% and maintains that this provides additional support for his opinion. However, the court finds little weight or relevancy of this publication to the question at hand and will disregard it.

On the other hand, Wagner testified that plus or minus five percent of variability is the reasonable range. He states that this is the case, in part, because the Ohio Department of Health is attempting to verify a known, or given target, that is, the manufacturer's value. Other support for this proposition is that the Ohio Department of Health has accepted this degree of variability for twenty years or more, and the concept is firmly imbedded in Ohio Department of Health regulations and procedures. These same regulations and procedures have been upheld countless times by numerous courts of this state.

In particular Ohio Adm.Code 3701–53–04(A)(1) requires the calibration test to be within five percent of the target value. Ohio Department of Health protocol as testified to by Wagner requires and accepts the five percent deviation. The study conducted by Sutheimer and Ferguson accepts this premise. In fact, State's Exhibit 4, which is a letter from Dr. James L. Ferguson, Chief Toxicologist and Director of the Forensic Toxicology Division of the Franklin County Coroner's Office, concludes the following from the independent audit that he conducted:

"The objectives of the independent audit by Dr. Craig Sutheimer, Chief Toxicologist for the Cuyahoga County Coroner's Office[,] and myself, James Ferguson, Chief Toxicologist for the Franklin County Coroner's Office, was to

* * * review the laboratory procedures and practices [with] an eye to compliance with good laboratory practice, to review the protocols for approval based on sound statistical treatment of the analytical data, and finally to retrospectively review the analytical data from which past certifications had been met.

"Based on that audit those procedures and practices were found to be acceptable. New statistical treatments were applied to data freshly extracted from the original raw laboratory records. All nineteen lots of breath testing calibrator solutions previously certified were found by us to have met specification. Restated, all lots previously certified met their stated target values with an acceptable degree of scientific error."

It is important to realize and recognize that this is not a legislative hearing but rather a court determination of whether or not the Ohio Department of Health regulations were followed, and, if followed, whether the procedures are satisfactory and whether there has been an abuse of discretion.

Given the clear state of the evidence and even Dr. Staubus' own testimony, it is clear to this court that Ohio Department of Health regulations and protocol were followed.

Defendant then asserts that these regulations and protocol are not "satisfactory" as required by R.C. 3701.143 and/or there has been an abuse of discretion. However, the court finds that Dr. Staubus's opinion that a one percent range of variability is a proper standard standing alone is not enough to overcome the presumptive validity of the administrative rules,[1] the opinion of Wagner, the practice of Sutheimer and Ferguson, and the accepted practice of Ohio Department of Health regulations for twenty years. Therefore, the court finds that the five percent acceptable range of variability as used by the Ohio Department of Health is not unsatisfactory as that term is used in R.C. 3701.143, nor is its use an abuse of discretion. Absent an abuse of discretion, a court may not substitute its own judgment as to testing techniques deemed reliable by the Director of Health. *State v. Brockway* (1981), 2 Ohio App.3d 227, 2 OBR 247, 441 N.E.2d 602.

The question arose as to how the manufacturer could achieve a target value of .100 and the Department of Health achieve a target value of .102. The answer to this question lies in the inherent inaccuracy of any testing procedure. Dr.

---

1. In accordance with the general rule applicable to acts of public officers, the action of an administrative agency within the limits of the jurisdiction conferred by law is presumed, in the absence of proof to the contrary, to be valid and to have been done in good faith and in the exercise of sound judgment. *Rowland v. State* (1922), 104 Ohio St. 366, 135 N.E. 622. In the absence of evidence to the contrary, the agency will be presumed to have properly performed its duties and not to have acted illegally, but regularly and in a lawful manner. *Bloch v. Glander* (1949), 151 Ohio St. 381, 39 O.O. 216, 86 N.E.2d 318.

Staubus was of the opinion that the .102 value as determined by the various tests by Ohio Department of Health personnel was a "truer" value than that determined by the manufacturer. However, when it was noted that the .102 value as determined by the Ohio Department of Health was the result of only four replicates taken from three bottles or a total of twelve individual tests and when he was asked to assume that the manufacturer conducted a thousand tests on a thousand bottles and came up with .100 value, even Dr. Staubus testified that the manufacturer's value would be "truer" than that determined by the Ohio Department of Health, given this assumption. It is a fact that there was no testimony presented as to the testing procedure of the manufacturer, but there is a presumption that administrative regulations are valid,[2] and the court will presume that the manufacturer performed a sufficient number of tests to establish the .100 value as scientifically accurate. In addition, the court finds that the acceptable range of variability from this value is plus or minus five percent and therefore the calculations and testing performed by the Ohio Department of Health as confirmed by Dr. Porter and as confirmed by Sutheimer and Ferguson verify the manufacturer's value.

II. Batch No. 96901.

The same rationale as set forth above applies to this solution batch as well. However, there are additional concerns that attend Batch No. 96901.

The first concern has to do with Ohio Department of Health protocol. Wagner testified that it was the Ohio Department of Health protocol to require the manufacturer to certify the target value of the solution and to forward this certification along with three to four samples randomly drawn from the Batch to the Ohio Department of Health for independent analysis. In regard to Batch No. 96901, the evidence disclosed that the certification and the sample bottles were sent by Repco Manufacturing Co., which was a distributor and not a manufacturer. This the court concludes does not follow Ohio Department of Health protocol and therefore is not a satisfactory procedure as required by R.C. 3701.143.

Moreover, the original certificate issued by the Ohio Department of Health regarding Batch No. 96901 states that this batch contains 1.21 plus or minus two percent milligrams per milliliters of alcohol. The certificate then claims that Batch No. 96901 will produce a target value of .100 grams per 210 liters. A review of State's Exhibit 1 discloses that this value apparently came from the certification from Repco Marketing, Inc., which provides that random samples of Lot No. 96901 of alcohol solution for simulators containing .121 plus or minus two percent grams per deciliter weight per volume of alcohol.

---

2. See fn. 1.

Dr. Staubus testified that it is scientifically impossible for a solution containing 1.21 plus or minus two percent milligrams per milliliter of alcohol to produce a target value of .100 grams per 210 liters. Staubus further testified that this is impossible because of the fact that the certificate states "plus or minus two percent (2%)." According to Dr. Staubus, this converts into a target range as opposed to a target value. Therefore, it is the court's opinion that the certificate was deficient on the face of it and that the calibrating officer would not be able to conclude that the calibration was within the ninety-five percent accuracy rate or plus or minus five percent. At some time subsequent a "corrected" certificate concerning the calibration solution was issued by the Ohio Department of Health. However, there was no evidence presented that this corrected certificate was in the hands of the calibrating officer at the time of calibration. This court has previously addressed a "correction" of a calibration solution certificate by the Ohio Department of Health. In *Sidney v. Harvey* (Jan. 29, 1996), Sidney M.C. No. 95–TRC–4996, unreported, the court had before it the issue of a calibration solution certificate that was originally certified by the Department of Health to only two decimal places (.10) and the dates that the breath testing machine was calibrated.

In *Harvey*, the corrected certificate showed that the target value was .100. The calibrating officer in *Harvey* did not have the corrected certificate at the time he calibrated the machine. This court found that it was incumbent upon the officer in charge of calibrations to note the problem which was apparent on the face of the certificate and to take remedial steps when the problem was first perceived.

Likewise, in the instant case regarding Batch No. 96901, it was apparent that there was a problem on the face of the certificate, and it was incumbent upon the calibrating officer to attempt to remedy that problem immediately. For the reasons set forth above, the tests in regard to Batch 96901 are accordingly suppressed.

*Judgment accordingly.*