Jean C. ERICKSON, Appellant,

v.

MUNICIPALITY OF ANCHORAGE, Appellee.

No. 7058.

Court of Appeals of Alaska.

April 29, 1983.

Marcia Vandercook, Gilmore & Feldman, Anchorage, for appellant.

Michael Marsh, Asst. Mun. Prosecutor, Allen M. Bailey, Mun. Prosecutor, and Jerry Wertzbaugher, Mun. Atty., Anchorage, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION OF THE COURT

SINGLETON, Judge.

Jean C. Erickson was convicted of driving while intoxicated. AMC 9.28.020. She appeals contending that the trial court erred (1) in admitting certain evidence; (2) in denying a motion for a judgment of acquittal; (3) in instructing the jury; and (4) in failing to sustain objections to the prosecutor's arguments. All of these contentions rest on two propositions. Erickson first contends that a conviction for a violation of AMC 9.28.020 requires proof of the defendant's blood-alcohol level at the time he drives a motor vehicle. Second, she claims that where the prosecutor's case depends upon a blood-alcohol test administered to a defendant after he ceases driving, there must in addition be expert testimony providing a nexus between the results of the test and the driver's blood-alcohol level at the earlier time when he was driving. *See, e.g., Page v. State,* 657 P.2d 850 (Alaska App.1983) (where an inference from one specific fact to another fact requires reliance on a proposition of generalized knowledge, which is not subject to judicial notice, the proposition must be proved by expert testimony). We affirm the decision of the district court.

### PART I

AMC § 9.28.020 provides:

*Driving While Intoxicated.*

A.  It is unlawful for any person to commit the crime of driving while intoxicated.

B.  A person commits the crime of driving while intoxicated if he or she operates, drives or is in actual physical control of a motor vehicle ...

. . . .

2.  when there is 0.10% or more by weight of alcohol in his or her blood or 100 milligrams or more of alcohol per 100 milliliters of his or her blood, or when there is 0.10 gram or more of

alcohol per 210 liters of his or her breath as determined by a chemical test within four hours of the offense . . .

■ We are satisfied that the assembly, by utilizing the language "as determined by a chemical test within four hours of his arrest . . . ," intended to establish two presumptions when it enacted the foregoing ordinance: (1) that a "chemical test," which includes a breathalyzer examination, accurately reflects a subject's blood-alcohol level at the time it is administered and (2) that an examination of a subject conducted within four hours of his driving will result in a reading equal to or less than the actual blood-alcohol rate at the time of driving. *Doyle v. State,* 633 P.2d 306, 310 (Alaska App.1981).[1] Presentation of these presumptions to the jury is governed by A.R.E. 303 which provides:

(a) *Effect.*

(1) *Presumptions Directed Against an Accused.* In all criminal cases when not otherwise provided for by statute, by these rules or by judicial decision, a presumption directed against the accused imposes no burden of going forward with evidence to rebut or meet the presumption and does not shift to the accused the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. However, if the accused fails to offer evidence to rebut or meet the presumption, the court must instruct the jury that it may, but is not required to, infer the existence of the presumed fact from the proved fact, but no mention of the word "presumption" shall be made to the jury. If the accused offers evidence to rebut or meet the presumption, the court may instruct the jury that it may, but is not required to, infer the existence of the presumed fact from the proved fact, but no mention of the word "presumption" shall be made to the jury.

In his commentary to A.R.E. 303, Professor Saltzburg explains the reasons for the rule and its intended operation as follows:

If a presumption cannot be binding on a defendant, what is its utility? Judge Weinstein identifies a two-fold function:

Presumptions are utilized to overcome two separate problems in federal law. Primarily this function is to lessen the prosecution's burden of establishing guilt by authorizing short-cuts in proof and exerting pressure on the person with the most knowledge to come forward with an explanation . . . .

In addition, a presumption may serve the secondary function of making undesirable activities amenable to federal jurisdiction.

---

1. We believe the following language from *Doyle* instructive:

Doyle contends that Instruction No. 8 was confusing as to the time the presumption applies. However, the language seems to us to be unequivocal with respect to the application of the presumption. It makes clear the fact that a breathalyzer of .10 percent or greater gives rise to a presumption that the defendant was under the influence "at the time of the alleged offense," which is precisely what AS 28.35.033 contemplates. That provision reads, in pertinent part:

. . . the amount of alcohol in the person's blood *at the time alleged, as shown by chemical analysis of the person's breath,* shall give rise to the following presumptions . . . [Emphasis added.]

Thus, under the wording of AS 28.35.033, the breathalyzer result is clearly viewed as the presumptive equivalent of the amount of alcohol in the person's blood "at the time al-

leged"; in other words, at the time that the offense was committed.

The state is correct in pointing out that to construe AS 28.35.033 to the contrary would be anomalous. If the statute were construed to create only a presumption that a person with .10 percent or more blood alcohol is under the influence of intoxicating liquor at the time the test is administered, then it would be necessary for the state to call expert witnesses in every case to establish by extrapolation the blood alcohol content of the defendant at the time of the alleged offense. Since one of the obvious reasons for the breathalyzer presumption is to avoid the necessity of calling expert witnesses in each case, such a construction would be senseless. 633 P.2d at 310–11. While the statute construed in *Doyle* and the ordinance considered here differ in some respects, we consider them analogous and *Doyle* persuasive.

1 Weinstein's Evidence, Paragraph 303[01] (1975). The second function is of no concern to the states in their lawmaking activities. But a third function may be important. "In a borderline case a judge may be influenced by the legislative judgment of Congress [or a state legislature] to submit a basic fact to a jury which he would not have submitted as merely circustantial [sic] evidence of the presumed fact." *Id.* Thus, the first and third functions are the important ones for the states. There also may be a fourth function—to make clear the intent of the legislature in special circumstances.

Subdivision (a) allows presumptions to perform their intended functions, but prevents them from exerting too great an impact on the outcome of a case. If a presumption is created by the legislature or the courts, it serves as an incentive for the accused to submit rebuttal evidence. If no rebuttal evidence or insufficient evidence is offered, the court, without using the word "presumption," will instruct the jury that it may, but is not bound to, infer the existence of the presumed fact from proof of the basic fact. Such an instruction is couched purely in terms of a permissible inference; no attempt is made to guide the jury in assessing the sufficiency of the inference to prove guilt. This mandatory instruction is in the nature of a mild comment on the evidence. No good reason appears why the legislature or the courts cannot require a specific non-binding instruction when they deem it desirable.

If the accused offers evidence to rebut or meet the presumption, the giving of an instruction is discretionary. In instances where the nature of a presumption directed against the accused is such that the relationship between the proved fact and the presumed fact is self-evident or apparent, no instruction should normally be given by the court if the accused offers evidence to rebut or meet the presumption, since in such instances, a jury instruction would tend to emphasize unduly and unnecessarily the existence of the presumption. On the other hand, in circumstances where there is no obvious connection between the proved fact and the presumed fact, an instruction to the jury regarding the existence of the presumption would ordinarily be appropriate.

A good example of this latter situation would be the standard case involving the presumption created by a Breathalyzer examination. The proved fact in such a case would be a Breathalyzer reading of .10 percent blood alcohol or greater; the fact to be presumed from the proved fact is that the accused was under the influence of intoxicating liquor at the time of the test. Under normal circumstances, with no expert testimony concerning the significance of .10 percent blood alcohol level in terms of its effect on an individual's sobriety, the mere awareness of the proved fact—i.e., the .10 percent blood alcohol level—would be meaningless to the average juror. Assuming the accused in such a situation was willing to concede the blood alcohol level, but opted to rebut the presumption by arguing that, despite the blood alcohol level, he was not in fact impaired, the mere establishment of blood alcohol level by the prosecution would be rendered wholly ineffective in the absence of a specific instruction to the jury concerning the presumption which arises from proof of a blood alcohol level of .10 percent or greater. It should be noted that the burden of coming forward is less onerous here than in Rule 301. This reflects a judgment that the defendant should have the benefit of reasonable doubts.

Commentary to A.R.E. 303 at 57–59.

The jury was instructed on two theories of driving while intoxicated. The jury was told:

The essential elements of the offense of driving while intoxicated in this case are as follows:

1. That at the time and place charged in the complaint, the defendant was operating or driving a motor vehicle in the Municipality of Anchorage, and

2. At the time defendant operated said vehicle, he either,

    (a) was under the influence of intoxicating liquor, or,

    (b) had 0.10 grams of alcohol or more per 210 liters of his breath.

■ While our view of the ordinance would have entitled the municipality to further instructions indicating the effect of the "presumptions" we believe established by the ordinance, defendant was not prejudiced by the absence of those instructions. In summary, we hold that the breathalyzer result alone established a *prima facie* case, entitling the municipality to go to the jury on the issue of Erickson's blood-alcohol level at the time of her driving. The court did not err in its instructions or in denying the motion for judgment of acquittal. By the same token, the prosecutor's remarks in closing argument were within the range of the evidence and not improper.

### PART II

As an alternate holding, if we were to accept *arguendo* Erickson's construction of the ordinance, we would reject her contention that the evidence presented to the jury would have been insufficient to enable it to determine that her blood-alcohol rate at the time she was driving exceeded the ordinance's limitations. *A fortiori,* we would reject her contention that expert evidence was necessary to relate a person's blood-alcohol rate at the time a test is administered to their blood-alcohol rate at an earlier time when they were driving.

On March 19, 1982, at 3:44 a.m., Anchorage Police Officer Joseph Roseman observed a small blue car being driven southbound on Minnesota Boulevard with only the parking lights illuminated. Officer Roseman observed the vehicle stop "abruptly" for the red light at the intersection of Tudor Road and Minnesota. After the light changed to green, the driver of the vehicle made a left turn on to Tudor from the middle lane of Minnesota. Officer Roseman activated his overhead lights and his alternating front lights. Only when he turned on his siren, 200 to 300 yards later, did the vehicle pull over.

■ After approaching the vehicle, Officer Roseman asked to see Ms. Erickson's driver's license. After she produced it, she attempted to get out of the car, but had left it in gear so it started to roll backward. Officer Roseman told her to put her foot on the brake, which she did, and then she put the car in "park."

Officer Roseman asked Ms. Erickson if she had been drinking; she responded affirmatively, "yes sir, a few beers." Officer Roseman asked her to perform a few field-sobriety tests which she failed. Specifically, he asked her to count backward by fives from fifty. She could not do that completely. She also could not recite the entire alphabet in two attempts. Finally, she swayed front to back when asked to stand with her feet together, hands down to her sides, head tilted backward, and with her eyes closed. Based on her performance of these tests and her demeanor, Officer Roseman concluded that Erickson was intoxicated.

After her arrest, Ms. Erickson was taken to the police station for the mandatory observation period and a breathalyzer examination, which was given to her at 4:14 a.m., twenty-eight minutes after Erickson was stopped by Roseman. The results showed slightly over 0.20 grams of alcohol per 210 liters of breath. Ms. Erickson was videotaped at that time.

We have previously held that such evidence may be offered to corroborate the results indicated by the breathalyzer, *see Byrne v. State,* 654 P.2d 795 (Alaska App. 1982), or undermine them, *see Denison v. Anchorage,* 630 P.2d 1001, 1003 (Alaska App.1981). More importantly, we believe the evidence tends to show that Erickson's alcohol level was elevated at the time she operated the vehicle and not merely at the time of the test. *See State v. Clark,* 286 Or. 33, 593 P.2d 123 (Or.1979), and *State v. Swarengin,* 12 Or.App. 290, 506 P.2d 729 (Or.App.1973). We therefore decline to follow the Vermont Supreme Court's decision in *State v. Dacey,* 138 Vt. 491, 418 A.2d 856

(Vt.1980) (expert testimony necessary to establish nexus between blood-alcohol level at time test administered and blood-alcohol level at time defendant operated vehicle).

Finally, Erickson argues that this view of the evidence violates the rule that when circumstantial evidence is relied on by the prosecution in opposition to a motion for judgment of acquittal, the evidence must be so conclusive as to exclude any other reasonable inference inconsistent with guilt. The Alaska Supreme Court has repudiated this test on a number of occasions holding that the same test should be applied to a determination of whether or not to grant a judgment of acquittal, whether the prosecution's evidence is direct or circumstantial. *See Jacobson v. State,* 551 P.2d 935, 940 (Alaska 1976); *Des Jardins v. State,* 551 P.2d 181, 184–85 (Alaska 1976).

Consequently, if we were to accept Erickson's construction of the ordinance in question and hold that the municipality must prove, without the aid of any presumption, that her blood-alcohol level exceeded .10 at the time she operated her vehicle, we would conclude that reasonable people could find her guilty beyond a reasonable doubt in reliance on the evidence in this record. Under either interpretation of the ordinance, the trial court would not have erred in denying Erickson's motion for judgment of acquittal. *Jacobson v. State,* 551 P.2d at 941.

The judgment of the district court is AFFIRMED.[2]

SINGLETON, Judge, concurring.

The writer agrees with the majority that Erickson's appeal must fail no matter how we interpret the ordinance. If Erickson's interpretation of the ordinance is correct, then the jury was properly instructed and the breathalyzer results and the officer's observation of her behavior provided suffi-cient circumstantial evidence to convict her. If the ordinance establishes presumptions against the accused, permitting the jury to find guilt based only on the breathalyzer, then the instructions were actually more favorable to Erickson than she was entitled to receive. I would agree that at the very least the ordinance establishes the "presumptions" discussed in part I of the opinion. Nevertheless, I am convinced, after reviewing the authorities, that the ordinance, properly construed, is even more favorable to the municipality than a majority of the court is prepared to hold.

The subsection under consideration has two elements.[1] First, it must be established that the defendant drove a motor vehicle and, second, that within four hours of his driving a "chemical test" was administered to him resulting in a finding that there was "0.10% or more by weight of alcohol in his blood or 100 milligrams or more of alcohol per 100 milliliters of his blood, or when there is 0.10 gram or more of alcohol per 210 liters of his breath." If the trier of fact is convinced of these two facts beyond a reasonable doubt, the defendant is guilty as charged. The jury need not determine the precise blood-alcohol level that existed at any given time while the defendant was actually operating his vehicle. A similar statute was considered by the Delaware Superior Court in *State v. Rucker,* 297 A.2d 400 (Del.Super.Ct.1972).

The defendant argues that the essence of the offense is having a blood alcohol level of 0.100, or more, at the time of the driving and not at the time of the test. Defendant says the State failed to prove that the required percentage existed at the time he was driving. This argument fails to recognize that the statute in question spells out what shall constitute proof of the offense.

**2.** Chief Judge Bryner and the writer, subject to reservations expressed hereafter, join in parts I and II of the foregoing opinion. Judge Coats joins in part II only.

**1.** It is possible that the ordinance has a third element: (3) that the person did not consume additional alcohol from the time he ceased to drive until the time the test was administered. This question is discussed further in n. 3 *infra.* *See Doyle v. State,* 633 P.2d 306, 311 (Alaska App.1981).

Under the terms of the statute the trier of fact must determine whether the test results show the required percentage of alcohol in the blood. The trier of fact is not free to disregard the mandate of the statute or to question the wisdom of the General Assembly in providing that test results constitute proof of that element of the crime.

The possible variance in results between various types of tests and the possible variances in readings between tests taken while the accused was driving and those taken afterwards may be an inherent weakness of the statutory provisions. The General Assembly could have considered these possible variances when it enacted the legislation but the legislation is so worded as to preclude these factors from being considered as issues of fact.

If there had been evidence that the test was improperly administered, such evidence could cast such doubt on the result as could be considered by the trier of fact in determining whether the statutory requirements had been met. But, as indicated, evidence that the types of tests already approved by the General Assembly when properly conducted are still subject to possible variations in results, is not a matter which is here left to the trier of facts.

297 A.2d at 402–03.

Erickson's argument fails to distinguish between "legislative" and "adjudicative" facts and "stipulative" and "descriptive" definitions. Adjudicative facts are those that must be found beyond reasonable doubt by the trier of fact before there can be a conviction. Legislative facts are those assumptions of fact, involving social, political, economic or scientific considerations, which a legislature (including a municipal assembly) makes in the course of reaching the policy decisions which it articulates in the form of statutes and ordinances. *See, e.g., State v. Erickson,* 574 P.2d 1, 4–5 (Alaska 1978). Thus, it is probably true that in enacting the ordinance in question, the municipal assembly made certain factual assumptions. First, that a person driving a vehicle after consuming sufficient alcohol to register a blood-alcohol rate of .10 or more presents an unacceptable risk of danger to the public. Second, assuming that no alcohol is consumed between a person's ceasing to drive and his taking the test, that the test results will always be equal to or less than the blood-alcohol rate existing at the time of driving, *i.e.,* that the passage of time will more often than not result in a diminished blood-alcohol rate. While both of these factual assumptions may be subject to dispute and, to a limited extent, were disputed by expert testimony in the evidentiary hearing conducted in *Anchorage v. Serrano,* 649 P.2d 256 (Alaska App.1982), and *Cooley v. Anchorage,* 649 P.2d 251 (Alaska 1982),[2] it has never been necessary that a legislature's legislative factual assumptions be "probably right" to sustain a statute. It is sufficient if a reasonable legislator could believe them to be true. *See State v. Erickson,* 574 P.2d at 17–18; *Ravin v. State,* 537 P.2d 494, 505 n. 44 (Alaska 1975). A reasonable legislator could certainly believe both of the propositions of legislative fact which support enactment of AMC 9.28.020(A) and (B)(2). *See People v. Schrieber,* 45 Cal.App.3d 917, 119 Cal.Rptr. 812 (Cal.App.1975) (it is rea-

2. In *Cooley,* we considered a number of constitutional challenges to an ordinance which read in part:

It shall be unlawful for any person to operate, drive or be in actual physical control of an automobile, motorcycle or other motor vehicle in the municipality at such time as the alcohol content of his blood, by weight, is 0.10% or greater as determined by a test of his blood, breath or urine.

Former AMC 9.28.030(A) (Repealed).

In our treatment of these issues, we assumed, though we did not decide, that under that ordinance the test results were evidence from which the trier of fact would be asked to infer a blood alcohol rate *at the time of driving.* The distinguishing feature which appears in the ordinance under consideration here but which did not appear in the *Cooley* ordinance is the language: "as determined by a chemical test within four hours of his arrest." This language serves to shift the trier of fact's attention from the time of driving to the time of the administration of the test. Our language in *Cooley* is therefore not inconsistent with the result I would reach in this case.

sonable to assume that as time elapses, alcohol will be dissipated from the body resulting in a lower breath or blood-alcohol reading).

A "descriptive definition" purports to describe the way a term is generally used in communication, *i.e.,* in common usage; it is sometimes called a "lexical definition," *see* I.M. Copi, *Introduction to Logic,* 120 (4th ed. 1972). A "stipulative definition" purports to describe the way in which a given speaker intends to use a term; it may or may not correspond to one or more of the descriptive definitions of the term. *Id.* at 118–19. Generally, a legislative body is assumed to use terms in their "descriptive" sense, *i.e.,* in accord with common usage. *See* A. Dickerson, *The Interpretation and Application of Statutes,* at 223 (1975). However, a legislative body may utilize stipulative definitions so long as it makes its intention clear and does not create a constitutionally vague result. *See* 1A C.D. Sands, *Sutherland Statutory Construction,* §§ 27.01, 27.02 (4th ed. 1972).

In *State v. Erickson,* 574 P.2d 1 (Alaska 1978), the legislature defined the term "narcotic" to include "cocaine." Erickson challenged this definition on constitutional grounds and offered substantial expert testimony to show that cocaine was not a narcotic according to the ordinary usage of the term "narcotic." The supreme court held that the legislature had used the term narcotic in a "stipulated" way but made its intention sufficiently clear to avoid a vagueness challenge. It consequently rejected Erickson's constitutional challenge.

In the instant case, the Anchorage Assembly "stipulatively" defined the phrase "driving while intoxicated" to include anyone who (1) drives and (2) within four hours thereafter takes a test showing a .10 blood-alcohol reading (assuming that no alcohol was consumed in the interim). Since there is no vagueness problem with this statutory definition, the ordinance is valid.

Erickson does not deny that she drove a vehicle and that within four hours thereafter a blood-alcohol test was administered resulting in a reading within the statutory guidelines, nor does she contend that the breathalyzer test or the instrument used in that test was in any way defective. Finally, and perhaps most significantly, she does not contend that she consumed any alcohol from the time she ceased to drive until the time the test was administered.[3] Under

3. The municipal assembly evidently assumed that a .10% blood-alcohol rate rendered a driver unsafe and that a person's blood-alcohol rate decreases over time if no new alcohol is consumed. Thus, under this interpretation of the ordinance, the assembly considered the precise blood-alcohol rate at the time of driving irrelevant. Erickson did not offer any evidence that she consumed any alcohol from the time she ceased driving until the time the test was administered and the state's evidence was that she did not consume any alcohol during this time. Therefore, it is not necessary for us to determine the legal effect under the ordinance of testimony that alcohol was consumed in the interim, *i.e.,* whether the absence of interim drinking is an element of the offense or merely a circumstance relevant to the admissibility of the test, *i.e.,* a foundational fact. *See* A.R.E. 104(b).

Erickson points to expert testimony in the *Cooley* case which poses the hypothetical possibility that someone could consume a great deal of alcohol, as for example swallowing a bottle of whiskey in a chug-a-lug contest, jump into a vehicle and speed home before the alcohol took effect. Consequently, Erickson concludes, it is not always true that a later breathalyzer reading will be lower than the reading at the earlier time when driving took place even if no more alcohol is consumed in the interim. Erickson misses the point of the ordinance. She is arguing over "legislative" not "adjudicative" facts. Thus, the legislative body could well conclude that the person in Erickson's hypothetical creates an unacceptable risk of harm by her conduct without any compensating social utility even if she does not cause an accident. Such a person is in effect playing a form of Russian roulette with the driving public. Even if we assume Erickson's hypothetical is possible, it does not follow that the assembly could not rationally determine that the person in the hypothetical should be punished and structure the ordinance accordingly.

In summary, the legislative body evidently wishes to prohibit those who engage in excessive drinking from driving and uses the results of the subsequently administered test to differentiate between those who present an unacceptable risk and those who do not.

Finally, under this interpretation of the ordinance the precise blood-alcohol level at the time of driving is not an element of the offense.

these circumstances, the municipality proved everything it had to prove in order to justify her conviction.

COATS, Judge, concurring.

I concur in the result. The trial court's instructions were based on Erickson's interpretation of the ordinance that the municipality had to prove that Erickson's blood alcohol level was .10 percent at the time she drove. The municipality showed that the breathalyzer result was obtained within the four hour period to establish the foundation to admit the test. The breathalyzer result, .20 percent on a test taken within one-half hour of Erickson's driving, coupled with the other evidence showing Erickson's intoxication, was sufficient for the jury to conclude that Erickson was driving while intoxicated either on the theory that she was under the influence of alcohol or on the theory that her blood alcohol level was .10 percent. I therefore conclude that the municipality presented sufficient evidence, without an expert witness, to allow the jury to conclude that Erickson was guilty of the offense.