# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### MARCH SESSION, 1997



**FILED**

October 16, 1997

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9605-CC-00209** |
| | ) | |
| Appellee, | ) | **COFFEE COUNTY** |
| | ) | |
| | ) | |
| **V.** | ) | **HON. GERALD L. EWELL, SR.,** |
| | ) | **JUDGE** |
| **MARK T. SCISNEY** | ) | |
| | ) | **(DUI WHILE DRIVING** |
| Appellant. | ) | **COMMERCIAL VEHICLE)** |

FOR THE APPELLANT:

FOR THE APPELLEE:

**ROBERT S. PETERS**
Swafford, Peters & Priest
100 First Avenue, S.W.
Winchester, TN 37398

**JOHN KNOX WALKUP**
Attorney General & Reporter

**DEBORAH A. TULLIS**
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

**C. MICHAEL LAYNE**
District Attorney General

**STEPHEN E. WEITZMAN**
Assistant District Attorney General
307 South Woodland
P.O. Box 147
Manchester, TN 37355

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

A Coffee County jury found Defendant guilty of driving under the influence while operating a commercial motor vehicle in violation of Tennessee Code Annotated section 55-50-408. He appeals as of right pursuant to Rule 3, Tennessee Rules of Appellate Procedure. In a two (2) prong attack upon the sufficiency of the evidence, Defendant argues that the State failed to prove that his blood alcohol concentration was .04 or more, and also argues that the evidence was insufficient as the State proved his "alcohol by weight" rather than his blood alcohol concentration as required by the statute. The judgment of the trial court is affirmed.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

At approximately 1:00 a.m. on October 14, 1994, Defendant was operating an "18-wheeler" truck when he drove through the weigh station on the westbound side of Interstate 24 in Coffee County. Tim Garner, an officer with the Tennessee Public Service Commission at the time, was on duty and decided to check Defendant for his driver's license, log book, and medical certificate. According to Officer Garner, such random checks were a part of his duties and responsibilities. Defendant was given a signal to drive his truck around to the back of the checking area. After opening the door to Defendant's vehicle, Garner immediately smelled the odor of an intoxicating beverage. Garner requested his partner, Officer Slatton, to come and confirm the odor, and then to administer an alcohol breath test to Defendant using the Intoximeter 3000 machine located at the weigh station complex. Garner could not administer the test because he was not certified to do so, but Officer Slatton was properly certified to operate the Intoximeter 3000.

The record reflects that the Intoximeter 3000 test was properly administered pursuant to the requirements of State v. Sensing, 843 S.W.2d 412 (Tenn. 1992). The test result registered by the machine was .04. The only other proof of consumption of alcohol by Defendant was the odor of an intoxicant smelled by the officers and the Defendant's statement at the scene that he had consumed a couple of "tall beers" in Georgia "before he left."

At trial, the State produced the testimony of William Heaney, Jr., and Officers Garner and Slatton. Defendant did not testify and offered no proof. Mr. Heaney was the supervisor of the breath alcohol program for the State of Tennessee through his employment in the Forensic Services Division of the Tennessee Bureau of Investigation. As part of his employment duties, Heaney was required to regularly check and monitor the accuracy of Intoximeter 3000 machines throughout the state which are monitored by the T.B.I., including the machine used to test the Defendant on the night of his arrest. According to Heaney, each Intoximeter 3000 machine has a deviation rate of plus or minus .005 or plus or minus five (5%) percent, whichever is greater. In addition, Heaney noted that the machine is programed to automatically round downward to the nearest hundredth after it has interpreted the test. For instance, if the machine interprets a blood concentration by weight of .049999, it would print out a result of .04.

Heaney testified that the particular machine which was used to test Defendant was checked on July 21, 1994 and again on October 25, 1994. The accuracy of the machine is tested by taking known standards and "blowing" them

into the machine using "a simulator of known alcohol concentration." During the July 21, 1994 test, a known sample of .025 was used and the machine was reading high and gave a result of .0253. On the same date, the machine was also reading low when a known sample of .100 gave a result of .0976.

During the October 25, 1994 test, the 0.025 standard was run through the machine and it gave the result of 0.0262. When the .100 standard was submitted to the machine on October 25, 1994, it gave a result of .0985. Therefore during the two regular monitorings of the machine, before and after Defendant's arrest, the machine was reading both high and low, but within the acceptable tolerance of plus or minus .005.

From the proof in this record, we discern that a .04 reading on the Intoximeter 3000 can result from actual blood alcohol concentrations ranging from .035 to .054. We arrive at this conclusion from the following analysis of the evidence. If the machine is reading "high" .005, a .035 actual blood alcohol concentration would be interpreted and reported as a .04 by the Intoximeter 3000. If the machine were reading "low" .005, an actual blood alcohol concentration by weight of .054 would be interpreted by the machine as .049 and reported as a .04 after automatically rounding downward to the nearest hundredth. It is not clear at all in the record why the machine gives a result in the ten-thousandths when being monitored, but only in the hundredths when being used to test persons suspected of being under the influence of alcohol.

Based on the record, it appears that, when carried to the thousandths, a .04 printout could be the result of twenty (20) different blood alcohol concentrations. Five (5) of those (.035 - .0359) would be below .04.

Defendant alleges that based upon the proof in this record, the State failed to prove beyond a reasonable doubt that he was guilty of the crime charged since there is a distinct mathematical possibility that his blood alcohol concentration was less than .04. The issue presented by Defendant is apparently one of first impression in Tennessee. Neither the State nor the Defendant in this appeal have cited or relied upon any cases from other jurisdictions which address this precise issue.

However, we have been able to find cases from other jurisdictions which have dealt with the issue. Some of these cases have taken the position urged by Defendant. In State v. Boehmer, 1 Haw. App. 44, 613 P.2d 916 (1980), two (2) separate cases were consolidated for appeal. In each case, the Defendant was arrested for driving under the influence and given a breathalyzer test. Defendant Boehmer's test showed .11 weight of alcohol and Defendant Gogo's test result was .10 weight of alcohol in the blood. In both cases, the undisputed proof was that the particular breathalyzer machine had a margin of error of 0.0165. The statute involved was not a "per se" statute as found in Tennessee Code Annotated section 55-50-408, but rather provided that if a defendant had .10 or more by weight of alcohol in his or her blood, it created a presumption that the defendant was under the influence of intoxicating liquor. The Hawaii Court of Appeals recognized that it was apparent the trial judge relied

upon the breathalyzer test as creating a presumption of each defendant's state of intoxication. The court reversed and remanded both cases and specifically held:

> The failure of the prosecution to establish beyond a reasonable doubt that the actual weight of alcohol in defendant's blood was at least .10% required the trial judge to ignore the statutory presumption in its determination.

Boehmer, 613 P.2d at 918.

In State v. Bjornsen, 201 Neb. 709, 271 N.W.2d 839 (1978), the defendant appealed from his conviction of operating a motor vehicle while having .10 percent alcohol by weight in this blood. The Nebraska Supreme Court noted that there was no evidence of the defendant's intoxication to sustain a conviction other than the results of the blood test. The arresting officer observed that the defendant had an odor of alcohol on his breath and that there was a partially filled wine bottle found at the scene. The results of the defendant's blood test was .10 percent of alcohol by weight. The expert who testified at trial stated that this result was accurate "within five thousandths [.005] of a percent." The Supreme Court of Nebraska reversed the conviction and dismissed the case. In doing so, the court held:

> While the Legislature has the acknowledged right to prescribe acceptable methods of testing for alcohol content in body fluids and perhaps even the right to prescribe that such evidence is admissible in a court of law, it is a judicial determination as to whether this evidence is sufficient to sustain a conviction, if the evidence is believed. The Legislature has selected a particular percent of alcohol to be a criminal offense if present in a person operating a

> motor vehicle. It is not unreasonable to require that the test, designed to show that percent, do so outside of any error or tolerance inherent in the testing process.

Bjornsen, 271 N.W.2d at 710-11.

In Haynes v. State, Department of Public Safety, 865 P.2d 753 (Alaska 1993), the Appellant Haynes' driver's license was revoked under Alaska law because following his arrest for driving while intoxicated, the result of an Intoximeter 3000 test showed a reading of .106 grams of alcohol per 210 liters of breath. Alaska statutes permitted revocation of a driver's license upon a chemical test producing a result of .10 or more. In that case, the testimony at trial was that the Intoximeter 3000 had a recognized margin of error of .01 grams per 210 liters of breath. The Alaska Supreme Court reversed the revocation of Mr. Haynes' driver's license. That court held that based upon the Alaska Constitution, it was a violation of due process to revoke a person's driver's license when the inherent margin of error of the testing device was not applied in favor of the person subject to license revocation. Haynes, 865 P.2d at 756.

Other jurisdictions have held that a similar margin of error does not require a conviction to be reversed based upon insufficiency of evidence. In State v. Lentini, 240 N.J.Super. 330, 573 A.2d 464 (1990), the Superior Court of New Jersey, Appellate Division, addressed the issue wherein the defendant was given two (2) breathalyzer tests, where both readings were exactly .10. In New Jersey at the time, the defendant was convicted under a statute which made it a criminal offense to operate "a motor vehicle with a blood alcohol concentration of 0.10% or more by weight of alcohol in the defendant's blood . . . ." Both the

defendant's expert witness and the trooper who arrested the defendant testified that the breathalyzer had an accuracy of plus or minus 0.01%. The court noted that the reading of 0.10 reflected a blood alcohol concentration anywhere between .09 and .11 percent. The New Jersey Court stated that the precise issue was whether the .10 reading from the properly operated and functioning machine was sufficient to support a conviction under the applicable statute in light of the 0.01% tolerance. That court deemed the issue to present a question of legislative intent. It analyzed several statutes in New Jersey which are similar to Tennessee Code Annotated section 55-10-408 (inference which can be raised by .10 percent by weight of alcohol in blood), Tennessee Code Annotated section 55-10-406 (implied consent law), and Tennessee Code Annotated section 55-10-405 (chemical test for alcohol content may include specimen of blood, urine, or breath). The New Jersey Court rejected the defendant's argument that the inherent margin of error of the breathalyzer machine, where the result reported was .10, prevented the State from proving the offense beyond a reasonable doubt. The New Jersey Court held:

> In the present case, defendant seeks to blunt the Legislature's resolve by giving new vigor to the probative value of expert testimony in the interest of eliminating a possible deviation of 1/100 of a percent. If defendant's contention is adopted, the presumptions established by N.J.S.A. 39:450.1(1) and (2), (see footnote one, supra) as well as the per se bright line of 0.10% would have to be adjusted in derogation of the statutes' objective standards. The adjustment would have to be made on a case-by-case basis depending on the expert testimony introduced in each case. No expert is bound by the opinion evidence in the present case regarding any breathalyzer's margin of deviation. Thus, the carefully construed regulatory scheme will in many cases again become a battle of the experts. As Tischio [State v. Tischio, 107 N.J. 504, 527 A.2d 388 (1987)] demonstrated, that would be inconsistent with the Legislature's intent.

Moreover, if it cannot be determined, as appears to be the case, whether the tolerance is to be added to or subtracted from the breathalyzer reading, then, contrary to the statute, a 0.11% reading will be required to establish the per se violation.

Lentini, 573 A.2d at 467.

In King v. Commonwealth, 875 S.W.2d 902 (Ky. App. 1993), the defendant was convicted for a "per se DUI." The Intoxilyzer 5000 machine was used to test the defendant's blood alcohol concentration and gave a result of .100. There was uncontradicted evidence at trial that the particular machine's margin of error was plus or minus .005. In the appeal, the defendant alleged that his rights to due process of law were violated when he was denied a directed verdict for acquittal given the fact that the results admitted into evidence were within the margin of error.

The Kentucky Court of Appeals stated the issue to be:

[I]s an Intoxilyzer 5000 reading of .100 sufficient, probative evidence to prove beyond a reasonable doubt that a person has an 'alcohol concentration in his blood or breath of .10 or more' as required by KRS 189A.010(1)(a) when the intoxilyzer machine in question has a margin of error of plus/minus .005? We think that it is and affirm the Circuit Court.

King, 875 S.W.2d at 902.

The Kentucky Court of Appeals noted that in our imperfect world, any machine, including intoxilyzers, would have a margin of error. The court then addressed the question of how much of a margin of error would be tolerated before a reading would no longer be credible or be of any probative value. While

agreeing that the margin of error of the machine should be considered in determining the probative value of the machine's results, the court noted that the admissibility of the evidence based upon the reliability of the machine was an issue for the trial judge. In reaching its conclusion, the Kentucky Court of Appeals held,

> The .005 margin of error leaves the possibility of the absolute true reading to fall within the range of .095 to .105. That is a possibility of five thousandths above or below a true reading. Where the Legislature speaks in terms of an alcohol concentration of .10, they merely went into the hundredths . . . . To exclude a reading with a possible error of five thousandths would be requiring the Commonwealth to prove in the realm of beyond "any" doubt [as opposed to proving beyond a reasonable doubt].

King, 875 S.W.2d at 903 (emphasis added).

In State v. Rucker, 297 A.2d 400 (Del. Super. Ct. 1972), the trial court in Delaware reversed the dismissal of the defendant's DUI case by the Delaware Court of Common Pleas. The pertinent statute, as quoted in the opinion states as follows:

> Any person who drives, operates, or has in actual physical control a motor vehicle while such person's blood has reached a blood alcohol concentration of 1/10 of 1% or more, by weight, as shown by a chemical analysis of a blood, breath, or urine sample taken within four (4) hours of the alleged offense, shall be guilty under this section.

Rucker, 297 A.2d at 402.

The Delaware Court of Common Pleas found that the Defendant's reading from the "Mobat" machine was 0.104. With a margin of error of as much as 0.009, the possibility was that the Defendant had an actual blood alcohol

concentration of 0.095.  On this basis, the lower court dismissed the case.  In reversing, the trial court in Delaware held:

> Under the terms of the statute, the trier of fact must determine whether the test results show the required percentage of alcohol in the blood.  <u>The trier of fact is not free to disregard the mandate of the statute or to question the wisdom of the General Assembly in providing that test results constitute proof of that element of the crime</u>.
>
> The possible variance in results between various types of tests and the possible  variances in readings between tests taken while the accused was driving and those taken afterwards may be an inherent weakness of the statutory provisions.  The General Assembly could have considered these possible variances when it enacted the legislation, but the legislation is so worded as to preclude these factors from being considered as issues of fact.

<u>Rucker</u>, 297 A.2d at 402-03 (emphasis added)

Tennessee Code Annotated section 55-50-408 provides as follows:

> **Driving under the influence** -- For purposes of this chapter and § 55-10-401, any person who drives, operates or exercises physical control of a commercial motor vehicle with a blood alcohol concentration of point zero four (.04) or more commits the offense of driving while under the influence of alcohol, in violation of  § 55-50-405.

Tennessee Code Annotated section 55-10-406(a)(1) provides in part, "[a]ny person who drives any motor vehicle in the State of Tennessee shall be deemed to have given consent to a test for the purpose of determining the alcoholic or drug content of that person's blood;" Tennessee Code Annotated section 55-10-405(5) provides that "'[t]est' means any chemical test designed to determine the alcoholic or drug content of the blood.  The specimen to be used for such test shall include blood, urine or breath."

In State v. Snyder, 835 S.W.2d 30 (Tenn. Crim. App. 1992), the defendant was convicted of a violation of Tennessee Code Annotated section 55-50-408. He was operating a tractor trailer rig and was stopped by an officer of the Tennessee Public Service Commission for a routine safety inspection. Detecting an odor of alcohol and bloodshot eyes, as well as two (2) empty beer cans and a partially full can of beer in the cab of the truck (a passenger was also inside), the officer administered an Intoximeter 3000 test on the defendant. The test was given twice and each time registered .04. All witnesses concurred that the defendant's ability to drive was not visibly impaired. In fact, that case reflects that the Public Service Commission officer ordered the defendant to drive from the scene of the inspection to the Carter County Courthouse for administration of the intoximeter test. In overruling the defendant's issue that the trial court erred by not charging the jury that it had to find him actually physically under the influence of an intoxicant to return a guilty verdict, our court held:

> By enacting T.C.A. § 55-50-408, the legislature made it a crime to operate a commercial motor vehicle with a blood alcohol concentration of point zero four (.04) or more. Neither the need to prove impairment nor the rebuttable presumption contained in T.C.A. § 55-10-408 applies in such cases. The language of the statute is clear and references to the other DUI provisions in the code indicate that the legislature intended to create a higher standard of care for those who drive commercial motor vehicles.

Snyder, 835 S.W.2d at 32.

In State v. Sensing, 843 S.W.2d 412 (Tenn. 1992), our supreme court set forth new standards for a breath test to be admissible in court. In doing so, the court specifically discussed the Intoximeter 3000 and noted that it had a systematic error of plus or minus five (5%) percent or 0.005 percent weight to

volume, whichever is greater.  While acknowledging in the context of DUI cases (which are not "per se" DUI cases) that the scientific tests are corroborative evidence which may exonerate as well as convict an accused person in a close case, the supreme court further stated,

> Indeed the purpose of all the testing is to provide objective scientific data to eliminate guesswork and speculation and to supplement the fallible observations of humans.

Sensing, 843 S.W.2d at 417.

I am inclined to accept the reasoning of the courts in State v. Lentini, 240 N.J.Super. 330, 573 A.2d 464 (1990), King v. Commonwealth, 875 S.W.2d 902 (Ky. App. 1993), and State v. Rucker, 297 A.2d 400 (Del. Super. Ct. 1972), in light of the above-quoted provisions of our statutory law and under the reasoning expressed in the Tennessee cases of Sensing and Snyder.

Similar to New Jersey, our legislature has enacted statutes which reflect the importance placed upon curbing the problem of drivers operating vehicles while under the influence of intoxicants.  Specifically, any driver in Tennessee has given his or her implied consent to be tested by blood, urine, or breath specimen when suspected of operating a vehicle under the influence of intoxicants. Tenn. Code Ann. §§ 55-10-405 - 406.  Tennessee Code Annotated section 55-50-408 is a "per se" driving under the influence statute similar to the statutes in New Jersey, Kentucky, and Delaware.  Our supreme court in Sensing has approved the admissibility into evidence of the Intoximeter 3000 result when a proper foundation has been laid.  Our court in Snyder has already recognized

the legislative intent to create a higher standard of care for those who drive commercial motor vehicles. As in Kentucky, our legislature has spoken in terms of an alcohol concentration in the hundredths, rather than in the thousandths. Similar to the situation addressed by the Kentucky Court of Appeals in King, the margin of error of the Intoximeter 3000 is in the thousandths rather than the hundredths. When read in pari materia, our statutes show a legislative intent that the properly taken test results of a specimen of breath constitute proof of the necessary element of blood alcohol concentration. Therefore, in this case there was sufficient evidence to sustain Defendant's conviction upon an Intoximeter 3000 reading of .04. This issue is without merit.

In his other attack upon the sufficiency of the evidence, Defendant argues that the conviction should be reversed because the statute speaks in terms of blood alcohol concentration of .04 or more, and the Intoximeter 3000 machine gives the result by "weight of alcohol for every 100 cc's or 100 milliliters of blood." Mr. Heaney, the supervisor of the blood alcohol program for Tennessee, testified that the Intoximeter 3000 measures the weight of alcohol in the subject's blood, i.e. it is the weight of alcohol for every 100 cubic centimeters of blood. He further testified that "blood alcohol concentration" is a general term that can mean either volume of alcohol in the blood or weight of alcohol in the blood.

In a footnote to Sensing, our supreme court recognized that the term blood alcohol concentration is expressed in a percentage of weight by volume based upon the grams of alcohol per 100 cubic centimeters of blood.

Specifically, the court stated "a BAC (blood alcohol concentration) of 0.10% w/v means 0.10 grams of alcohol per 100 cubic centimeters of blood or 0.10 grams of alcohol per every 210 liters of breath." Sensing, 843 S.W.2d at 415, n. 2.

Under Sensing, the Defendant's argument that this case should be dismissed because there was not proof of "blood alcohol concentration" is without merit.

Having found Defendant's issues to be without merit, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:


_____
JOSEPH M. TIPTON, Judge


_____
JOE G. RILEY, Judge